**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEUTSCHE LUFTHANSA AG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-5338 |
| | ) | |
| CITY OF CHICAGO, a Municipal Corporation | ) | |
| and SCOTT FLINTZ, as an individual and | ) | |
| employee of the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

NOW COMES the plaintiff, DEUTSCHE LUFTHANSA AG ("LUFTHANSA"), by and through its attorneys, McBreen & Kopko LLP, and for its Complaint against defendants, CITY OF CHICAGO and SCOTT FLINTZ, avers as follows:

1.    LUFTHANSA is a corporation organized under the laws of the country of Germany with its principal place of business located at Von-Gablenz-Strasse 2-6, 50679 Cologne, Germany. LUFTHANSA is in the business of providing commercial air transport services.  LUFTHANSA operates at various airports throughout the United States, including Chicago-O'Hare International Airport ("O'Hare").

2.    Upon information and belief, the CITY OF CHICAGO ("CITY"), is a municipal corporation organized and existing under the laws of Illinois, and in accordance with its statutory responsibilities, owns and operates O'Hare.

3.    Upon information and belief, SCOTT FLINTZ ("FLINTZ"), is a resident of the City of Chicago, County of Cook, State of Illinois.  At all times relevant hereto, FLINTZ,

was employed by the CITY and the CHICAGO FIRE DEPARTMENT ("CFD"), as a paramedic and ambulance driver.

## JURISDICTION

4.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1332(a)(2), as the parties are the citizens of a state and a foreign state, respectively, and the amount in controversy exceeds the jurisdictional minimum of this Court.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391(b)(2) because the events giving rise to plaintiff's claims occurred in this judicial district, or a substantial part of the property that was the subject of the action was situated in this judicial district.

## FACTUAL ALLEGATIONS

6.      At all times relevant, plaintiff, LUFTHANSA, was the owner and/or operator of a Boeing 747-400 aircraft, registration number D-ABTA ("the Aircraft").

7.      At all times relevant, defendant, the CITY, through the CFD provided fire suppression, prevention and ambulance services at O'Hare in Chicago, Illinois.

8.      At all times relevant, the CITY and CFD owned and operated a Ford F450 Ambulance, Vehicle Identification Number 1FDXF4GR2AEA35177, ("Ambulance 26").

9.      On or about January 1, 1990, LUFTHANSA and the CITY entered into an International Terminal Use Agreement and Facilities Lease ("Use Agreement"). A copy of the Use Agreement is attached hereto and incorporated herein by reference as Exhibit "A". Pursuant to the terms and conditions of the Use Agreement, the CITY contracted to provide certain services in connection with LUFTHANSA'S operations at O'Hare.

10.     The Use Agreement between LUFTHANSA and the CITY contains the following provisions:

### Section 3.01 – Use of Airfield Area and International Terminal Aircraft Parking Areas

(a)     Airlines shall have the right to conduct an Air Transportation Business at the Airport, to act as a contract or private carrier, and to perform all operations and functions as are incidental, necessary or proper thereto, including the following:

(i) The right to land, take-off, fly and move aircraft operated by Airline on the Airfield Area;

(ii)  The right to use the International Terminal Aircraft Parking Areas as provided in Section 3.05 to permit Airline's employees, agents and contractors to load an unload persons, property, cargo and mail upon and from aircraft operated by Airline, and, if on a temporary basis or if permitted by Section 17.03, by another person engaged in an Air Transportation Business, by such means as may be reasonably necessary or convenient;

(iii) The right to use the International Terminal Aircraft Parking Areas as provided in Section 3.05 to service aircraft and other equipment operated by Airline, and if on a temporary bases or if permitted by Section 17.03, by another person engaged in an Air Transportation Business, with gasoline, oil, greases, lubricants and other fuel or propellant and with foods and beverages and other supplies and materials, by such means as may be reasonably necessary or proper;

(iv) The right to repair, condition, maintain, test and park aircraft and other equipment operated by Airline, and if on a temporary basis or if permitted by Section 17.03, by another person engaged in an Air Transportation Business, on the International Terminal Aircraft parking Areas; provided, however, such repair, conditioning, maintenance and testing shall be limited to those activities at the time commonly considered routine ramp servicing (which includes the activities referred to in items (ii) and (iii) above);

(v)  The right to park aircraft on aircraft parking areas (other than the International Terminal Aircraft Parking Areas) designated from time to time by City as available for common use;

…

(xi) The right to conduct any operations or activities other than those enumerated above, reasonably related to the landing, take-off, flying, moving, loading, unloading or ramp servicing of aircraft or the movement of passengers, which are reasonably necessary or convenient to the conduct by Airline of an Air Transportation Business; provided, however, that all such other operations and activities shall be subject to prior written approval of the Commissioner.

### Section 3.03 – Use of Exclusive Use Premises

(a)  Airline shall have the right to use its Exclusive Use Premises for any and all purposes reasonably necessary, convenient or incidental to the conduct by Airline of an Air Transportation Business, …

### Section 3.05 – Priority Use of Common Use Premises and International Terminal Aircraft Parking Areas

Airline shall have the right to use, on a priority basis in common with other International Terminal Airlines Parties, the Common Use Premises and the International Terminal Aircraft Parking Areas.  Airline shall have the right to use the holdroom portions of the Common Use Premises for the enplaning and deplaning of passengers.  City shall adopt written rules and regulations to be followed and enforced by City with respect to access to and use of the Common Use Premises and the Equipment, and shall adopt, consistent with the principles set forth in Exhibit D, written rules and regulations to be followed and enforced by City with respect to priority of access to and use of the International Terminal Aircraft Parking Areas.  Such written rules and regulations, and any subsequent changes thereto, will be adopted by City after consultation with the International Terminal Airline Parties.

**Section 10.01 – <u>Operation and Maintenance</u>**

(a)   City shall, in accordance with Exhibit H, operate, maintain and keep in good repair, expend such amounts for O&M Expenses of the International Terminal Area as shall be reasonable and necessary therefore, all of the areas and facilities of the International Terminal except as specifically excepted by Section 9.01. City's obligation with respect to the operation and maintenance of the Equipment and certain of the Common Use Premises shall be governed by the terms of the Consortium Agreement.

(b) City shall operate and maintain the Airport in good repair, in a reasonably prudent manner and in accordance with the rules, regulations and orders of any Federal or State agency having jurisdiction with respect thereto.

…

(e)   City shall supply adequate lighting for the Airport, including adequate landing lights, floodlights, beacons and other field lighting.

…

(i)   City shall maintain order at the Airport.

**Section 12.02 – <u>Compliance with Laws</u>**

City and Airline shall comply with all applicable Federal, state and local laws, codes, regulations, ordinances, rules and orders; provided, however, that City or Airline may, without being considered to be in breach hereof, contest any such laws so long as such contest is diligently commenced and prosecuted by City or Airline, as the case may be.

**Section 14.03 – <u>Insurance Maintained by City</u>**

City shall maintain, or cause to be maintained, insurance with respect to the Airport (except the Land Support Area) against such casualties and contingencies and in amounts not less than reasonably prudent.  Without limiting the foregoing, City shall maintain, or cause to maintained, the following insurance with respect to the Airport (except the Land Support Area):

…

(a)     Comprehensive general public liability insurance including blanket contractual liability and personal injury liability (with employee exclusion deleted), and on-premises automobile insurance including owned, non-owned and hired automobiles used and operated by City, protecting City against liability for injuries to persons and property arising out of the existence of operation of the Airport (except Land Support Area in limits as follows: for personal injury and bodily injury, $100,000,000 for each occurrence and $100,000,000 annual aggregate; and for property damage, $100,000,000 for each occurrence and $100,000,000 annual aggregate.

### Section 19.02 – **No Remedy Exclusive**

No remedy conferred upon or reserved to Airline in this Agreement shall be exclusive of any other available remedy, and each such other remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute.  No delay or omission in exercising any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle Airline to exercise any remedy under it has under this Agreement, it shall not be necessary to give any notice other than such notice as may be herein expressly required.

### Section 20.06 – **Covenant of Quiet Enjoyment**

Upon the payment by Airline of all International Terminal Area Fees and Charges, Special Revenue Bond Fees and Charges, Landing Fees and Fueling System Fees properly charged to the Airline and the performance of the covenants and agreements on the part of the Airline to be performed hereunder, Airline shall peaceably have and enjoy the premises, appurtenances, facilities, licenses and privileges granted herein.

11.     At all times relevant, and in compliance with its obligations under the Use Agreement, the City promulgated rules and regulations governing the operation of motor vehicles at O'Hare.  A copy of the Ground Motor Vehicle Operation Regulations Manual ("Manual") is attached hereto and incorporated herein by reference as Exhibit "B".

12.     The Manual contains the following provisions:

## 2. APPLICABILITY OF REGULATIONS

These regulations apply to all pedestrians and all persons acting as Ground Motor Vehicle Operators (as defined above) or in control of a Ground Motor Vehicle within the security perimeter of the Airport and all passengers in Ground Motor Vehicles. These regulations are in addition to applicable ordinances of the City of Chicago and laws of the State of Illinois and the United Stated of America, which remain in full force and effect… Employers will be held responsible for any reckless aircraft, Ground Motor Vehicle or equipment operation or activity by their employees, agents, and/or contractors or any parties employed as subcontractors.

Ex. B., p. 5.

## 10. OPERATIONS NEAR AIRCRAFT

A. No person operating a Ground Motor Vehicle on a Ramp, other than the operator of an aircraft-servicing vehicle for a designated Aircraft, will pass within 20 feet of a parked Aircraft

Ex. B., p. 11.

## 13. CARELESS AND RECKLESS DRIVING

**A. Careless Driving.** No person will operate a Ground Motor Vehicle or equipment within the security perimeter in a careless manner. Prudent vehicular operation requires careful attention to the width, grade, curves, corners, proximity of aircraft, individuals on foot, traffic, use of roadways, weather conditions and all other attendant circumstances including the relevant provisions of "Miscellaneous Safety Requirements" given in Section 40 below, so as not to endanger the life, limb or property of any person.

**B. Reckless Driving.** No person will operate a Ground Motor Vehicle or equipment within the Security Perimeter in a reckless manner, with a willful or wanton disregard for the safety of persons or property. Reckless driving is defined in 625 ILCS 5/11-503.

Ex. B., pp. 13-14.

36. **GUIDES**

A. No person shall back up any Ground Motor Vehicles or other ground equipment (excluding small baggage tractors, passenger cars, vans, or sport-utility vehicles) on the Airfield when the driver's view is restricted by the design of the vehicle, the way in which it is loaded, or in any other way, unless a guide is positioned outside of the vehicle to assist the operator.

The guide, who cannot be in the vehicle, must be clearly visible to the operator of the Ground Motor Vehicle being guided, must have an unobstructed view of the area behind the vehicle being guided, must be able to signal the operator of the guided vehicle, and must be able to stop all adjacent traffic.

Ex. B., p.22.

## COUNT I – WILLFUL AND WANTON MISCONDUCT

13. Plaintiff, LUFTHANSA, hereby incorporates by reference each and every allegation set forth in paragraphs 1 though 12 above as fully as if the same were recited herein at length.

14. On or about July 29, 2012, the Aircraft was parked at gate M-11 at O'Hare.

15. At all times relevant, SCOTT FLINTZ was in control of and driving CFD Ambulance 26 in the course of his employment with the CITY in and around the ramp area of Gate M11.

16. FLINTZ, in violation of the Airport's rules and regulations, and with careless and reckless disregard for the safety of the property of others proceeded to back CFD Ambulance 26 while his view was restricted and without the assistance of a guide person thereby striking the Number 1 engine of the Aircraft, causing extensive damage.

17.     At all times relevant, the CITY and its employee, FLINTZ, showed reckless disregard for the safety of plaintiff's property by committing one or more of the following acts:

a.      careless and recklessly operated the ambulance so as to pass within 20 feet of a parked aircraft in violation of section 10 of the City's rules and regulations;

b.      carelessly and recklessly operated the ambulance within the airport security perimeter by failing to pay prudent and careful attention to the proximity of aircraft in violation of section 13(a) of the City's rules and regulations;

c.      carelessly and recklessly operated the ambulance within the airport security perimeter in a willful and wanton manner as set for forth in 625 ILCS 5/11-503 in violation of section 13(b) of the City's rules and regulations;

d.      carelessly and recklessly backed up the ambulance on the airfield without the use of a guide person when defendant, FLINTZ, knew his view was restricted in violation of section 36(a) of the City's rules and regulations;

e.      carelessly and recklessly failed to provide sufficient training to CFD ambulance drivers regarding airport operations and the proper operation of motor vehicles at O'Hare; and

f.      were otherwise careless and reckless in the training of its driver and the operation of the ambulance on the airfield at O'Hare.

18.     Defendants' careless and reckless behavior proximately caused damage to LUFTHANSA'S Aircraft.

19.     An initial and immediate inspection revealed a puncture type hole in the Number 1 engine inlet cowl on the Aircraft .

20.     The damage that was incurred rendered the Aircraft unsafe to operate, requiring that it be immediately removed from service so that the Number 1 engine inlet cowl could be removed and repaired.

21.     In order to return the Aircraft to service as soon as expeditiously possible, LUFTHANSA located and leased a Number 1 engine inlet cowl from United Parcel Service thereby incurring additional charges.

22.     The damaged Number 1 engine inlet cowl was subsequently repaired at a total cost to LUFTHANSA of $92,777.86.

23.     LUFTHANSA also paid approximately $145,520.96 to United Parcel Service for the installation, use and subsequent removal of the loaner engine inlet cowl on the Aircraft.

24.     As a result of defendants' careless and reckless actions and inactions set forth herein, LUFTHANSA has been damaged in an amount to be determined at trial but believed to be no less than $238,298.83, including, but not limited to, the cost of repair, replacement parts, loaner parts and re-working of the Aircraft and its associated components, loss of the Aircraft's use, along with such other and further damages as LUFTHANSA may be entitled to under the law.

WHEREFORE, the plaintiff, DEUTSCHE LUFTHANSA AG, demands judgment against defendants, CITY OF CHICAGO and SCOTT FLINTZ, in an amount to be determined at trial, in excess of $238,298.83, plus interest and costs to the extent permitted by law, and such other and further relief as justice requires.

## COUNT II – BREACH OF CONTRACT BY THE CITY OF CHICAGO

25.     Plaintiff, LUFTHANSA, hereby incorporates by reference each and every allegation set forth in paragraphs 1 though 24 above as fully as if the same were recited herein at length.

26.     Under the terms and conditions of the Use Agreement, it was the CITY'S obligation to operate O'Hare in a careful and safe manner so as to permit LUFTHANSA to

quietly enjoy the premises it had leased, including the aircraft parking areas, essential to the conduct of its business as an air carrier. The CITY was obligated to train its employees with regard to the operation of ground motor vehicles in close proximity to aircraft and to enforce its own rules and regulations with regard to such operations.

27. At all times relevant, LUFTHANSA was in full compliance with and duly performed all its obligations and duties under the Use Agreement.

28. On July 29, 2012, the CITY breached its contract with LUFTHANSA by failing to adequately operate and maintain the Airport in a reasonably prudent manner and by impeding LUFTHANSA'S right to park its aircraft in a safe and secure area to conduct its operations. Specifically, the CITY failed to provide proper escort for CFD Ambulance 26, failed to comply with and enforce the rules and regulations with regard to the operation of motor vehicles when located in proximity to parked aircraft, including the use of guidemen, and failed to properly train its employees to properly escort vehicles and re-position vehicles when located in proximity to parked aircraft, all of which are part of the operations of O'Hare. Further, the CITY'S failure to properly operate the Airport deprived LUFTHANSA of its entitlement to quiet enjoyment of the premises for the conduct of its operations as an air carrier.

29. As a direct and proximate result of the CITY'S breach of its Use Agreement, LUFTHANSA'S Aircraft was damaged. The damage that was incurred by LUFTHANSA rendered the Aircraft unsafe to operate, requiring that it be immediately removed from service so that the Number 1 engine inlet cowl could be removed and repaired.

30.     In order to return the Aircraft to service as soon as expeditiously possible, LUFTHANSA located and leased a Number 1 engine inlet cowl from United Parcel Service thereby incurring additional charges.

31.     The damaged Number 1 engine inlet cowl was subsequently repaired at a total cost to LUFTHANSA of $92,777.86.

32.     LUFTHANSA also paid approximately $145,520.96 to United Parcel Service for the installation, use and subsequent removal of the loaner engine inlet cowl on the Aircraft.

33.     On or about May 14, 2013, LUFTHANSA filed a property damage claim form with the CITY OF CHICAGO, Office of the City Clerk. LUFTHANSA has not received a response thereto.  See Exhibit "C" attached.

34.     LUFTHANSA was damaged in the amount of $238,298.83, plus interest and costs thereon from July 29, 2012, no part of which has been paid although duly demanded.

35.     As a result of defendants' breach of the Use Agreement, LUFTHANSA has been damaged in an amount to be determined at trial but believed to be no less than $238,298.83, including, but not limited to, the cost of repair, replacement parts, loaner parts and re-working of the Aircraft and its associated components, loss of the Aircraft's use, along with such other and further damages as LUFTHANSA may be entitled to under the law.

WHEREFORE, the plaintiff, DEUTSCHE LUFTHANSA AG, demands judgment against defendants, CITY OF CHICAGO and SCOTT FLINTZ, in an amount to be determined at trial, in excess of $238,298.83, plus interest and costs to the extent permitted by law, and such other and further relief as justice requires.

Dated: July 26, 2013                    Respectfully submitted,


                                        /s/____*Hugh G. McBreen*_____
                                        Hugh G. McBreen
                                        Annie K. Strobl
                                        McBreen & Kopko LLP
                                        29 S. LaSalle Street, Suite 850
                                        Chicago, IL   60603
                                        Telephone:   312-332-6405
                                        hmcbreen@mmklaw.com
                                        astrobl@mmklaw.com
                                        Attorneys for Deutsche Lufthansa AG